Karon Rosenfield WRIGHT, Individually and in her capacity as Successor Trustee of the Abby Greenberg Rosenfield Trust and the Jacob Greenberg Trust, Appellant,

v.

Joyce Z. GREENBERG, Independent Executrix of the Estate of Jacob Greenberg, Deceased, and Trustee of the Jacob Greenberg Family Trust, Appellee.

No. 14-98-00987-CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 9, 1999.

Alan V. Ytterberg, Houston, for appellant.

Linda L. Kelly, Houston, for appellee.

Panel consists of Justices MAURICE E. AMIDEI, EDELMAN and FROST.

## MAJORITY OPINION

MAURICE E. AMIDEI, Justice.

Karon Rosenfield Wright (Karon), individually and as trustee of two testamentary trusts, appeals from two summary judgments for Joyce Z. Greenberg (Joyce), independent executrix of her deceased husband's (Jacob's) estate and trustee of a trust established by him prior to his death. In three issues, Karon contends the trial court erred in granting summary judgments in favor of Joyce because (1) there is no evidence that Jacob exercised the power of appointment in his will, and Jacob was estopped to exercise the power of appointment, (2) Joyce was estopped to assert the statute of limitations or other affirmative defenses, and (3) Joyce failed to negate the discovery rule by proving Karon discovered or should have discovered Jacob's alleged breach of trust. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Lurine Karon Greenberg (Lurine) was Jacob's first wife, and she died in 1975. Karon is Jacob's and Lurine's daughter, and is the same person known as Abby Greenberg Rosenfield. In her will, Lurine left all of her residuary estate to Jacob in trust, and directed him to divide the trust estate equally between the "Jacob Greenberg Trust" and the "Abby Greenberg Rosenfield Trust." By the terms of her will, Lurine named Jacob the trustee and beneficiary of the Jacob Greenberg Trust (Jacob's Trust), and named Jacob the trustee of the Abby Greenberg Rosenfield Trust (Karon's Trust). Jacob was given the discretionary power to distribute the trust income and corpus of Karon's Trust to Karon in such amounts as he believed "for the best interests" of Karon. Upon the death of Jacob, Lurine's will appointed

Karon as successor trustee of Karon's Trust. Lurine's will gave Jacob "the power to appoint the entire remaining principal of Jacob's Trust, free of the trust, by will, irrespective of the time of his death, in favor of his estate." Should Jacob fail to exercise that power, Lurine's will provided that the remaining principal of Jacob's Trust passed to Karon's Trust with Karon as successor trustee.

Jacob died in 1995 and his will named his second wife, Joyce, the independent executrix of his will. That will provided:

> By this Will, I intend to dispose of all my property (that owned by me and that over which I have any power of disposition), real, personal and mixed, of whatever kind and wherever situated, *including any property over which I may have a power of appointment* (emphasis added).

In the residuary clause of Jacob's will, he left all of the "rest, residue and remainder" of his estate to the trustee or successor trustee of the Jacob Greenberg Family Trust created in 1988. After Jacob died, and his will was admitted to probate, Karon sued Joyce for an accounting of both trusts, damages for Jacob's alleged mishandling of the trusts, a declaratory judgment that Jacob's will was not a valid exercise of the power of appointment in Lurine's will, and an order that the corpus of Jacob's Trust be turned over to Karon as successor trustee to the two testamentary trusts established by Lurine's will.

Joyce filed a motion for partial summary judgment, alleging that Jacob's will effectively exercised the power of appointment given to him under Lurine's will as a matter of law. Karon responded alleging that Jacob's will did not specifically refer to the power of appointment in Lurine's will, nor did Jacob's will refer to the property subject to the power of appointment. Furthermore, Karon contended Jacob's will did not dispose of the property over which he had a power of appointment, but only stated his "intention" to dispose of proper-

ty over which he had a power. Thereafter, Karon filed her second amended original petition alleging additionally that Jacob was estopped to exercise the power of appointment, and Joyce was estopped to assert the statute of limitations and all other affirmative defenses to Karon's actions for accounting, breach of trust, and claims for damages. By her second amended original answer, following Karon's amended petition, Joyce contended Karon's claims for an accounting are barred by the four-year statute of limitations, and Karon knew or should have known of Jacob's alleged mishandling of the trust within the four-years from the alleged breach of trust. Joyce filed a second motion for summary judgment further contending she was not estopped from asserting any and all defenses, and that Karon's actions regarding the funding, distribution or administration of Karon's Trust were time barred. The trial court granted Joyce's first motion for partial summary judgment on the ground that she established as a matter of law that Jacob's will exercised his testamentary power of appointment over the assets of Jacob's Trust under Lurine's will. The trial court also granted Joyce's second motion for partial summary judgment without stating any grounds. Both summary judgments were made final and severed from the remaining part of the case for purposes of this appeal.

## II. SUMMARY JUDGMENTS.

### A. Standard of Review.

In order to prevail on summary judgment, the defendant as movant must disprove at least one of the essential elements of each of the plaintiff's causes of action. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991). This burden requires the movant to show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). In determining whether a material fact issue

exists to preclude summary judgment, evidence favoring the nonmovant is taken as true, and all reasonable inferences are indulged in favor of the nonmovant. *Id.; see also Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995). Any doubt is resolved in favor of the nonmovant. *Nixon,* 690 S.W.2d at 548–49; *see also Doe,* 907 S.W.2d at 477.

 A summary judgment may be affirmed on any of the movant's theories which has merit. *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 627 (Tex. 1996). Appellate courts should consider all grounds for summary judgment (1) on which the trial court rules, (2) the movant preserves for appellate review, and (3) are necessary for final disposition of the appeal when reviewing a summary judgment. *Id.* at 627. The appellate court may consider other grounds that the movant preserved for review and the trial court did not rule on in the interest of judicial economy. *Id.*

### B. The Exercise of the Power of Appointment.

In issue one, Karon contends Jacob's will was not an effective exercise of the power of appointment given to him by Lurine's will because: (1) Jacob's will makes no disposition of the property over which he had the power, but only states his "intention" to dispose of all of his property; (2) Jacob's will does not refer to the power of appointment granted in Lurine's will; and (3) Jacob's will makes no reference to the property that is the subject of the power of appointment. Karon contends that because there was no exercise of the power of appointment, the appointive estate in Lurine's will did not pass as directed in the residuary clause of Jacob's will.

 1. **Applicable Law.** A power of appointment is a power of disposition given to a person over property not his own, by someone who directs the mode in which that power shall be exercised by a particu-

lar instrument. *Republic National Bank of Dallas v. Fredericks,* 155 Tex. 79, 283 S.W.2d 39, 46 (1955). It is an authority to do an act which the owner granting the power might himself lawfully perform. *Id.* To constitute a valid exercise of a power of appointment, the supreme court stated:

> The general rule is that in order for a will or deed to constitute the exercise of a power of appointment the intent to exercise such power must be so clear that no other reasonable intent can be imputed under the will. The will must refer to the power of appointment or to the property subject to such power, or the donee of the power must have owned no other property to which the will could have attached and thus the will have been a vain and useless thing except it be held to be an exercise of the power [citations omitted].

> If, from the circumstances or the instrument executed, it be doubtful as to whether it was the intention to execute the power possessed by the grantor, then it will not be held that by such act or conveyance that power was in fact executed [citations omitted].

*Republic National Bank,* 283 S.W.2d at 47.

In *Republic,* A.C. Ebie's will left a part of a trust estate "to the legatees and devisees of my said son, in accordance with his last will and testament, if he shall leave a will, . . . ." *Id.* at 46. The will of Ebie's son, Russell, contained no reference to the power of appointment given under his father's will, but left his wife all of his property in fee simple. The supreme court found no reference in the will to the power of appointment; no language stating the will is exercising such power of appointment; no reference to A.C. Ebie's estate; and Russell did have property of his own at the making of his will, separate and apart from his interest in his father's estate given by the power of appointment. *Id.* at 47. Therefore, the supreme court found Russell's will did not exercise the power of appointment given him under his father's will. *Id.* at 48.

**2. The Summary Judgment Evidence.** In her first motion for summary judgment, Joyce argued that the interpretation to be given to Jacob's will demonstrated that Jacob exercised the power of appointment given by Lurine's will as a matter of law. Joyce attached as summary judgment proof: (1) Jacob's will, (2) the Jacob Greenberg Family Trust instrument, and (3) Lurine's will.

In her response, Karon attached as summary judgment proof her affidavit stating that Jacob had substantial assets and "income to support and maintain himself such that he would not have been authorized to distribute all of the principal of [Jacob's Trust] to himself."

**3. Application of the Law to the Facts.** Construction of a trust instrument is a question of law for the trial court when no ambiguity exists. *Hancock v. Krause,* 757 S.W.2d 117, 119 (Tex.App.-Houston[1st Dist.] 1988, no writ); *Nowlin v. Frost Nat. Bank,* 908 S.W.2d 283, 286 (Tex.App.-Houston[1st Dist.] 1995, no writ). If the court can give a certain or definite legal meaning or interpretation to the words of an instrument, it is unambiguous and the court may construe it as a matter of law. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). If, however, the meaning of the instrument is uncertain or reasonably susceptible to more than one meaning, it is ambiguous. *Id.* If it is ambiguous, then its interpretation presents a fact issue precluding summary judgment. *Id.* at 394; *Nowlin,* 908 S.W.2d at 286.

Under the *Republic National Bank* test, the will must refer to the power of appointment *or* to the property subject to such power, *or* the donee of the power must have owned no other property to which the will could have attached. . . . (Emphasis added). *Republic National Bank,* 283 S.W.2d at 47. *See also Lowe v. Ragland,* 156 Tex. 504, 297 S.W.2d 668, 674 (1957) (emphasizing that *one* of the three requirements must be met to prove

an exercise of the power). In this case, Jacob's will expressly stated that he intended to dispose of all of his property by his will, including *"any property over which I may have a power of appointment"* (emphasis added). Based on section 37, Texas Probate Code, Jacob was vested with the power of appointment granted to him in the will immediately upon Lurine's death; therefore, Jacob could and did exercise that power by his will. *See Foster v. Foster*, 884 S.W.2d 497, 500 (Tex.App.-Dallas 1993, no writ). Section 37 provides:

> When a person dies, leaving a lawful will, all of his estate devised or bequeathed by such will, *and all powers of appointment granted in such will*, shall vest immediately in the devisees and legatees of such estate and *the donees of such powers . . . .*

TEX. PROB.CODE ANN. § 37 (Vernon 1980 Supp.1999); *Foster*, 884 S.W.2d at 500.

█ Karon contends that Jacob's declaration in article I, whereby he states he intends to dispose of all of his property by his will, makes no disposition of the property. Karon contends such a declaration is "precatory boilerplate language" without a direction as to distribution. We disagree.

 "All rules of construction must yield to the basic intention and purpose of the testator as reflected by the entire instrument." *Shriner's Hospital, Etc. v. Stahl*, 610 S.W.2d 147, 151 (Tex.1980). "The intent of the testator, however, must be ascertained from the language used within the four corners of the instrument." *Id.* "The question is not what the testatrix intended to write, but the meaning of the words she actually used." *Id.* In the absence of ambiguity, we must construe the will based on the express language used. *Henderson v. Parker*, 728 S.W.2d 768, 770 (Tex.1987). We must determine what Jacob meant by what he actually said, and not by what he should have said, giving the words used in his will their common and ordinary meaning absent a contrary expression in the will. *White v. Taylor*, 155 Tex. 392, 286 S.W.2d 925 (1956); *Allen v. Talley*, 949 S.W.2d 59, 60 (Tex.App.-Eastland 1997, pet. denied). If the court can give a "certain or definite legal meaning or interpretation" to the words of an instrument, the instrument is unambiguous; and the court may construe it as a matter of law. *Coker*, 650 S.W.2d at 393. We find that Jacob clearly was referring to the power of appointment vested in him by Lurine's will when he stated *"any property over which I may have a power of appointment"* in his will. *Republic National Bank*, 283 S.W.2d at 47.

█ In his will, Jacob made specific bequests of his residence and all tangible personal property, excluding cash in hand or on deposit, to his wife, Joyce. He then transferred "rest, residue and remainder *of my estate*" of "every kind, character and description" to the trustee of the Jacob Greenberg Family Trust. Karon contends that there is no language in Jacob's will which specifically refers to the property subject to the power of appointment, therefore, the remaining assets in Jacob's Trust pass to Karon's Trust.

In *Krausse v. Barton*, 430 S.W.2d 44, 48–49 (Tex.Civ.App.-Houston[1st Dist.] 1968, writ ref'd. n.r.e.), the court of appeals found that the testator intended that the appointive estate become part of her residual estate, and that it was to pass to her executor under the terms of her will. *Id.* In that case, the court of appeals found that Nellie H. Wilson clearly was referring to the power of appointment donated to her by her husband's will when she stated, in Article I of her will, "even though a part of such property may not be subject to administration hereunder by my executor as part of the estate passing under this will," and again, in Article III, when she referred to "property over which I then shall have any power of testamentary disposition." *Id.* at 48. Her husband's will authorized Mrs. Wilson to appoint her own estate by her last will. *Id.* By Article I of

her will, Mrs. Wilson directed her executor to pay all debts, including the expenses of her last illness and funeral expenses, and taxes, including taxes levied by reason of the exercise of the power, from "the residue *of my estate* as herein devised and bequeathed" (emphasis added) *Id.* The court of appeals found that the meaning of the phrase "residue of my estate as herein devised and bequeathed," as it was probably understood by the testator, must be determined by reference to Article III. *Id.* By this article, Mrs. Wilson disposed of all other property "which I may own or claim at the time of my death or over which I then shall have power of testamentary disposition." *Id.* There was not enough money in the residue of her estate, aside from the property over which she had a power of testamentary disposition, to make the gifts to other relatives she wanted and pay the inheritance and estate taxes. *Id.* The court of appeals found that "[u]nder these circumstances the special bequests would be nugatory, a result which the testator in all probability did not intend." *Id.* The court of appeals concluded that Mrs. Wilson's will reflected "a clear indication that the testator intended that the appointive estate become part of her residual estate, and that it pass to her executor under the terms of the will." *Id.* at 49. Having found that Jacob did exercise the power of appointment, we further hold that by the terms of his will, Jacob intended that his appointive estate become part of his residual estate, and that the appointive estate under Lurine's will passed to the trustee of the Jacob Greenberg Family Trust.

▮▮▮ As a sub-issue, Karon further argues that Jacob failed to exercise the power of appointment in conformity with the requirements in Lurine's will which limited the power to appoint the property "free of the trust . . . in favor of his estate." In her brief, Karon cites *Allred v. Beggs,* 125 Tex. 584, 84 S.W.2d 223 (1935), as authority for her contention that "a testator may restrict the manner in which a power of appointment may be exercised

and the power, if effective, must be exercised in the manner specified." We find nothing in *Allred* that makes such a general statement. The only reference to a power is: "[A] provision in an instrument of gift for the execution of a power within a specified time is generally construed as directory only, unless it appears that the donor intended that time should be of the essence of the power conferred." *Id.* at 228. *Allred* is not authority for appellant's contention that Jacob improperly exercised his power of appointment. Karon's argument is nothing more than her interpretation of how she thinks the power should be exercised and is conclusory. Karon cites no authority to support her contentions and this contention is overruled. A point of error not supported by authority is waived. *See Trenholm v. Ratcliff,* 646 S.W.2d 927, 934 (Tex.1983). We overrule Karon's contentions in issue one that Jacob did not exercise the power of appointment donated to him in Lurine's will, and that the appointive estate did not pass by terms of the residuary clause in Jacob's will.

## C. ESTOPPEL

### 1. Was Jacob estopped to exercise the power of appointment?

As a sub-issue in issue one, Karon contends that Jacob was estopped to exercise the power of appointment in his will because he was a fiduciary owing "an unwavering duty of good faith, fair dealing, loyalty and fidelity" to the beneficiaries of Jacob's Trust, including the remainder beneficiary. Karon alleged this defense in her second amended original petition and in her response to Joyce's second motion for summary judgment. By the terms of the first summary judgment rendered by the trial court, the issues of estoppel and Joyce's affirmative defenses were not considered. Thereafter, Joyce filed her second motion for summary judgment alleging (1) Jacob was not estopped from exercising his testamentary power of appointment over the assets of Jacob's Trust; (2) Joyce was not estopped

from asserting any and all defenses to Karon's allegations; and (3) Karon is barred by the four-year statute of limitations to bring any action concerning the distribution or administration of Karon's Trust. In her second motion for summary judgment, Joyce alleged that Karon showed no authority to support her claim that Jacob was estopped to exercise the power, and her claim should be dismissed. Karon responded contending Joyce's second motion for summary judgment improperly sought to obtain summary judgment on Karon's pleadings without giving her an opportunity to amend. The trial court did not expressly rule on this objection, and Karon does not raise this issue on appeal.[1]

Karon cites no authority to support her conclusory argument that Jacob was estopped to exercise the power of appointment because he breached his fiduciary duties. A point of error not supported by authority is waived. *See Trenholm*, 646 S.W.2d at 934. We overrule Karon's sub-issue that Jacob was estopped to exercise the power of appointment.

## 2. Estoppel to assert the statute of limitations and affirmative defenses.

Joyce contends Karon's actions for accountings for both trusts are barred by the residual four-year statute of limitations. TEX. CIV. PRAC. & REM.CODE ANN. § 16.051 (Vernon 1997 & Supp.1999). In issue two, Karon contends Joyce is estopped to assert the statute of limitations and all other affirmative defenses.

Karon argues that her affidavit establishes her claim of equitable estoppel against Joyce to assert limitations and other affirmative defenses. She argues that her testimony in her affidavit shows that Jacob's conduct precluded inquiry into his dealings with Lurine's trusts. She claims she had "no other choice" than to show

respect to her father and rely on what information he saw fit to provide to her.

The only summary judgment proof attached to Karon's response was her affidavit. The only statements in Karon's affidavit relating to a claim of estoppel were:

6. "From before my mother's death until his death, my father bragged about his financial success and frequently complained about the amount of tax he had to pay. After his marriage to Joyce Z. Greenberg, my father travelled [sic] and entertained to an extent and in a style far in excess of the standard to which he had been accustomed while my mother was alive.

7. "My father told me a number of times that I would be "a very rich girl." I understood this to mean that I would receive at least the assets of the Jacob Greenberg Trust. I relied on this statement in not making further inquiry about both the Jacob Greenberg Trust and the Abby Greenberg Rosenfield Trust. Only after my father's death did I learn that my father had purported to terminate the Jacob Greenberg Trust before his death.

8. "From my mother's death until his death, my father provided me with only such information as he saw fit concerning my mother's estate and the Abby Greenberg Rosenfield Trust and no information about the Jacob Greenberg Trust. Any requests for information were met with angry tirades by my father. I felt I could not make inquiries of him without jeopardizing what positive relationship I and my sons did have with my father. Despite our problems, I felt I had no choice but to show respect for my father and rely on such information as he did provide me."

Joyce replied to Karon's response and objected that these statements were hearsay, inadmissible character evidence,

---

1. Because Karon has not raised the issue on appeal of the trial court's failure to require Joyce to specially except to Karon's pleading, concerning the issue of estoppel of Jacob to

exercise the power, we have nothing to review on this point. *See San Jacinto River Authority v. Duke*, 783 S.W.2d 209, 210 (Tex.1990).

and in violation of the Dead Man's statute (rule 601(b), Texas Rules of Evidence). There is no order sustaining or overruling these objections, and nothing in the judgment indicates the trial court considered these objections. Therefore, the objected to evidence remains a part of the summary judgment evidence. *See Giese v. NCNB Texas Forney Banking Center,* 881 S.W.2d 776, 782 (Tex.App.-Dallas 1994, no writ). On appeal, Karon contends her evidence raised a material fact issue and the trial court erred in granting Joyce's second motion for summary judgment.

■■■ To constitute an equitable estoppel, there must exist: (1) a false representation or concealment of material facts; (2) made with actual or constructive knowledge of the facts; (3) to a party without knowledge or the means of acquiring knowledge of the real facts; (4) made with the intention that it should be acted on; and (5) the party to whom it was made must have relied on or acted on it to his prejudice. *See Herschbach v. City of Corpus Christi,* 883 S.W.2d 720, 736–37 (Tex. App.–Corpus Christi 1994, writ denied).

■■■ In this case, Karon's affidavit fails to show any misrepresentation or concealment of material facts. The statement that Jacob told her she would be "a very rich girl," upon which she relied in not making any further inquiry about the trusts, is nothing more than an opinion and cannot be the basis of an equitable estoppel. To create an estoppel, the representation relied on must be a statement of material fact, and not a mere expression of opinion. *See Dallas Cowboys Football Club, Inc. v. Harris,* 348 S.W.2d 37, 43 (Tex.Civ.App.-Dallas 1961, no writ). The affidavit does not set forth *facts* to establish any element of equitable estoppel. The affidavit consists of conclusory statements concerning Karon's relationship with Jacob and what he did or did not do in general terms. Affidavits containing conclusory statements unsupported by facts are not competent summary judgment proof. *See Brownlee v. Brownlee,*

665 S.W.2d 111, 112 (Tex.1984); *Aldridge v. De Los Santos,* 878 S.W.2d 288, 296 (Tex.App.-Corpus Christi 1994, writ dism'd w.o.j.). More importantly, there is nothing in Karon's statement indicating she was prejudiced by Jacob's actions or inactions. Her statement provides no insight as to any detriment, loss, or injury she suffered by Jacob's actions or inactions. *See Randle v. NCNB Texas Nat. Bank,* 812 S.W.2d 381, 386–87 (Tex.App.–Dallas 1991, no writ). We find that Karon has not raised a material fact issue on any element of equitable estoppel.

■■■ Karon further argues that Jacob's "position, conduct and relationship effectively precluded inquiry into his dealings with" Lurine's trusts. A defendant is estopped from relying on limitations as an affirmative defense when the defendant is under a duty to make a disclosure but fraudulently conceals the existence of the cause of action from the party to whom it belongs. *Borderlon v. Peck,* 661 S.W.2d 907, 908 (Tex.1983). The estoppel effect ends when the party learns of facts or circumstances that would lead a reasonably prudent person to inquire and thereby discover the concealed cause of action. *Leeds v. Cooley,* 702 S.W.2d 213, 215 (Tex. App.—Houston [1 st Dist.] 1985, writ ref'd n.r.e.). As we indicated in our discussion above, Karon's affidavit is not summary judgment evidence of any element of equitable estoppel. Her conclusions that she had to rely on Jacob and respect his dealings with the trusts are not evidence of a concealment of a cause of action such as to create a fact issue of estoppel. Furthermore, Joyce attached documents to her second motion for summary judgment demonstrating that Jacob had notified Karon, in writing, that he was resigning as trustee of Karon's trust effective March 1, 1990. He remained the trustee of Jacob's trust until his death, and when his will was probated, whatever remained in Jacob's trust went to Joyce. Karon filed her original petition against Joyce on March 25, 1996, six years after she had been notified

that Jacob resigned as trustee. Her affidavit does not controvert the fact that more than four years passed from the time she was notified of Jacob's resignation as trustee until suit was filed. We find Joyce was not estopped to assert her claim of the statute of limitations or any affirmative defenses. Karon's contention in issue two that Joyce was so estopped is overruled.

## D. STATUTE OF LIMITATIONS.

■■ In her third issue, Karon contends her claim with respect to Karon's trust is not barred by limitations. Karon relies on *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex.1996), for the proposition that a breach of fiduciary duty is inherently undiscoverable because "a person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or unaware of the need to do so." *Id.*

In the recent case of *KPMG Peat Marwick v. HCH,* the supreme court set forth the standard of review for motions for summary judgment on the affirmative defense of limitations, as follows:

> A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense [citation omitted]. Thus, the defendant must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury [citations omitted]. If the movant establishes that the statute of limitations bars the action, the nonmovant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations [citation omitted].

*KPMG Peat Marwick v. Harrison County Housing,* 988 S.W.2d 746, 748 (Tex.1999).

**1. Did Joyce conclusively prove when the cause of action accrued?**

In her first amended original petition and counterclaim, Joyce pleaded that Karon's demand for an accounting and other claims were barred by the residual four-year statute of limitations, section 16.051, Texas Civil Practices and Remedies Code. In her second motion for partial summary judgment, Joyce alleged that any action for an accounting or for a breach of trust regarding the Abby Greenberg Rosenfield Trust accrued no later than March 1, 1990, the date of Jacob Greenberg's resignation as trustee. In support of that motion, Joyce attached copies of a letter from Jacob to Karon, dated April 16, 1981, stating he had set up the trusts pursuant to Lurine's will, and setting out in detail the sums of money she would receive. He asked Karon to sign the duplicate copy of that letter and the accounting which was attached to it to indicate her approval. In her handwritten letter to Jacob, Karon acknowledged receipt of the correspondence but stated: "I have decided not to sign the letter which you recently sent." Copies of Jacob's letters to Karon dated February 27, 1990, resigning as trustee of Karon's trust and appointing Karon's sons, Alan and Thomas as successor co-trustees, were attached. Jacob's resignation became effective as of March 1, 1990. Alan and Thomas signed the appointments as successor trustees to Karon's trust.

In her response, Karon objected to Joyce's summary judgment proof but never obtained a ruling on her objections from the trial court. Therefore, all Joyce's summary judgment proof remains a part of the summary judgment evidence. *See Giese v. NCNB Texas Forney Banking Center,* 881 S.W.2d 776, 782 (Tex.App.-Dallas 1994, no writ).

The only summary judgment proof offered in response to Joyce's summary judgment motion was Karon's conclusory affidavit discussed above under her estoppel claims. As we indicated, her affidavit raises no fact issues because it is conclusory. In her brief, Karon now asserts that

the discovery rule is applicable and *S.V. v. R.V.* makes a fiduciary's misconduct "inherently undiscoverable." *S.V. v. R.V.*, 933 S.W.2d at 8. She contends the burden is on Joyce to negate the discovery rule by proving as a matter of law that no issue of material fact exists concerning when Karon discovered or should have discovered the breach of trust.

We find that Joyce conclusively proved that this cause of action accrued no later than March 1, 1990, by Jacob's resignation as trustee of Karon's trust. Karon does not dispute that she received this notice. On appeal, Karon contends Joyce had to negate the discovery rule by proving there is no fact issue concerning when Karon discovered or should have discovered the harm. In *KPMG Peat Marwick*, the supreme court considered a similar contention. *KPMG Peat Marwick*, 988 S.W.2d at 749–50. In that case, Peat Marwick's summary judgment evidence conclusively established that the two-year statute of limitations had accrued more than two years prior to HCH filing its lawsuit. *Id.* at 749. HCH asserted that Peat Marwick fraudulently concealed its wrongful conduct, and thus, limitations did not begin to run until HCH knew or should have known of its injury. *Id.* HCH also asserted that its pleading was sufficient summary judgment evidence of the affirmative defense of fraudulent concealment to defeat Peat Marwick's summary judgment motion. *Id.* HCH did not raise fraudulent concealment as an affirmative defense to the statute of limitations. *Id.* The supreme court held:

> First, a party asserting fraudulent concealment as an affirmative defense to the statute of limitations has the burden to raise it in response to the summary judgment motion and to come forward with summary judgment evidence raising a fact issue on each element of the fraudulent concealment defense. A mere pleading does not satisfy either burden. Thus, even assuming that HCH pled fraudulent concealment as an affirmative defense to Peat Marwick's

answer pleading limitations, HCH still had to respond to Peat Marwick's summary judgment motion. There is no such response in the record. Therefore, HCH did not carry its burden to both plead the defense and support it with summary judgment evidence.

*KPMG Peat Marwick*, 988 S.W.2d at 749–50.

In this case, Karon did not allege, plead nor otherwise raise the discovery rule in her response to Joyce's second motion for partial summary judgment. Karon raises the negation of the discovery rule for the first time on appeal. The supreme court in *Peat Marwick* stated that the defendant must "negate the discovery rule, if it applies *and has been pleaded or otherwise raised* ...." *Id.* at 748. Karon neither pleaded the discovery rule defense nor otherwise raised it with her summary judgment affidavit. Therefore, we find that Joyce conclusively proved when the cause of action accrued. We overrule Karon's contention in issue three that the statute of limitations does not apply to her claim, and we affirm the judgment of the trial court.

FROST, Justice, concurring and dissenting.

I dissent with respect to the majority's decision to affirm the trial court's summary judgment finding that Jacob Greenberg exercised the power of appointment in his will in favor of the trustee of the Jacob Greenberg Family Trust, as raised in the first and second appellate issues. I would reverse the summary judgment on the issue of appointment and remand that issue to the trial court. I concur with the majority's decision on all other issues presented.

> "Why shouldn't we quarrel about a word? What is the good of words if they aren't important enough to quarrel over? Why do we choose one word more than another if there isn't any difference between them?"
>
> — G.K. Chesterton

## Introduction

Perhaps the biggest challenge jurists face is determining what men and women, now silenced by death, meant by the words they used to deal with matters that are of great import to those who survive them. Today, the court's task is to determine what the late Jacob Greenberg ("Jacob") meant by what he said (and did not say) in his will. We must decide whether the words he chose were sufficient to constitute an exercise of the power of appointment his first wife, the late Lurine Karon Greenberg ("Lurine") granted to him in her will to enable him to dispose of the property in the Jacob Greenberg Trust ("Jacob's Trust"). Absent a valid exercise of the power of appointment, the property subject to the power passes to the Abby Greenberg Rosenfield Trust ("Karon's Trust") for the benefit of the only child of Jacob and Lurine, Karon Rosenfield Wright ("Karon"), formerly known as Abby Greenberg, and her descendants. The majority finds that the language in Jacob's will demonstrates a clear intent to exercise the power in favor of Jacob's second wife, Joyce Z. Greenberg ("Joyce"), as trustee of the Jacob Greenberg Family Trust (the "Family Trust"), a trust Jacob and Joyce created during their marriage.

The standard for determining whether a donee/testator[1] has exercised a power of appointment, as set forth in *Republic National Bank of Dallas v. Fredericks*, 155 Tex. 79, 283 S.W.2d 39, 47 (1955), is simple, straightforward, and not particularly difficult to satisfy; yet, the language in Jacob's will does not pass the test, even when pieced together from unrelated sections of the document. The *only* mention of a power of appointment in Jacob's will is *not* in the context of an exercise of that power, but in a general introductory section that lacks any appointive language and contains a troublesome incongruity. The mere inclusion of the generic words "power of appointment" in the introductory section should not be elevated to an exercise of a specific power, especially where the identity of the appointee is missing and must be supplied by reference to an entirely different part of the will (the residuary clause), which itself does not mention the power of appointment and which is not tied, directly or indirectly, to the section that does.

Although it may be possible to interpret Article 1 of Jacob's will as foreshadowing an intention to exercise the power of appointment, Jacob failed to put any such notion into effect by following through with words of appointment or other language that would effect an exercise of the power and identify the appointee of the property. While another court has found the identity of an appointee by looking to the will's residuary clause,[2] that approach does not work in this case because, unlike the will in that case, the residuary clause in Jacob's will contains no reference to the power of appointment and, unlike the circumstances in that case, there is nothing in the record to indicate any intent to make the appointive estate part of Jacob's residuary estate. Furthermore, the residuary clause in Jacob's will speaks only to Jacob's estate; it does not purport to exercise the power of appointment or dispose of the property that is subject to the power. Absent any affirmative link between the general reference to "a power of appointment" in Article 1 and the residuary clause in Article 4, there is no basis for finding Joyce, as trustee of the Family Trust (the residuary beneficiary of Jacob's will), the appointee of the property that is

---

1. The person granting the power of appointment, such as a testator through a will, is the "donor." The person receiving the power is the "donee." The one who receives property from the donee is the "appointee." *See Foster v. Foster*, 884 S.W.2d 497, 500 (Tex.App.—Dallas 1993, no writ) (citations omitted).

2. *See Krausse v. Barton*, 430 S.W.2d 44, 47 (Tex.Civ.App.—Houston [1st Dist.] 1968, writ ref'd n.r.e.).

subject to the power Lurine granted to Jacob.

Despite painstaking analysis and unsparing scrutiny of the language in Jacob's will, we will never truly know if Jacob meant to exercise the power of appointment he possessed; but, *if* he did, he did so in a way that makes it doubtful as to whether it was his intention to do so and that, alone, precludes a finding that the power was in fact exercised. *See Republic,* 283 S.W.2d at 47 (citing *Hill v. Conrad,* 43 S.W. 789, 791 (Tex.1897)).

### THE SEARCH FOR CLEAR INTENT

As movant in the summary judgment proceeding, it was Joyce's burden to demonstrate that the language Jacob used in his will is "so clear" that it forecloses the possibility that some other reasonable intent could be imputed to him. *Republic,* 283 S.W.2d at 47. "If from the circumstances or the instrument executed, it be *doubtful* as to whether it was the intention to execute the power possessed by the grantor, then it will not be held that by such act or conveyance that power was in fact executed." *Id.* (quoting *Hill v. Conrad,* 91 Tex. 341, 43 S.W. 789, 791 (1897)) (emphasis added). The test is not whether the one seeking to prove the exercise of the power (Joyce) has proffered the most reasonable or most likely explanation of the donee's intent, as gleaned from the will. Instead, the test is whether it is possible to impute some other reasonable intent to the donee (Jacob) based on the language of the instrument or the surrounding circumstances. *Id.* Unless an intent to exercise the power is the *only* reasonable alternative, the *Republic* test is not met and the court cannot find an exercise of the power. Thus, the question before this court is:

Is it so clear from Jacob's will that he intended to exercise the power of appointment that no other reasonable intent can be imputed to him?

Unless this question can be answered affirmatively, the court has no choice but to find that Jacob did *not* exercise the power of appointment. *See Republic,* 283 S.W.2d at 47.

In addition to satisfying the "clear intent" requirement, in order to constitute a valid exercise of a power of appointment, the language in the will must meet at least *one* of the following criteria:

(1) It must refer to the power of appointment; *or*

(2) It must refer to the property subject to the power of appointment; *or*

(3) The donee of the power (Jacob) "must have owned no other property to which the will could have attached and thus the will have been a vain and useless thing except it be held to be an exercise of the power."

*Id.* (citations omitted).

It is undisputed that Jacob's will does not satisfy criteria (2) or (3). The only place in Jacob's will that the words "power of appointment" appear is in Article 1, which reads in pertinent part:

By this Will, I intend to dispose of all my property (that owned by me and that over which I have any power of disposition), real, personal and mixed, of whatever kind and wherever situated, including any property over which I may have a power of appointment. Such property will consist of my one-half interest in the community estate acquired by me and ... [Joyce], and also any separate property which I may own at the time of my death.

It is important to note that Article 1 does not specifically refer to the power of appointment Lurine granted to Jacob, nor does it identify any appointee/beneficiary of the exercise of that power. The majority looks to the residuary clause contained in Article 4, which itself does not mention or refer to any power of appointment, to supply that information. By employing this approach, the majority not only finds an exercise of a specific, unidentified power of appointment, but essentially creates an appointee of the prop-

erty that is subject to it. Whether read alone or in conjunction with the residuary clause in Article 4, the language in Article 1 is insufficient to constitute an exercise of the power of appointment because (1) there is no appointive language, (2) any language the majority is construing as appointive language is ambiguous and incongruous, and (3) there is no language identifying an appointee or connecting the power of appointment to the residuary estate.

### 1. Lack of Appointive Language

There is no language in Jacob's will that purports to constitute an exercise of the power of appointment. The phrase on which the majority relies makes a general comment about Jacob's "intention" in making his will, without ever actually exercising the power of appointment. Nowhere in his will does Jacob use *words of appointment,* clearly or unclearly.

In determining whether language is sufficient to satisfy the *Republic* criteria, other courts have relied on the presence of express language in the document purporting to exercise the power of appointment. For example, in *Foster,* the Dallas Court of Appeals, finding a valid exercise of a power of appointment, observed that the document purporting to exercise it "referenced the power of appointment granted under the [donor's] will and stated that the [donee] was expressly exercising that power." 884 S.W.2d at 499. The operative document contained the following appointive language:

> I, BILLY A. FOSTER, the donee of a power of appointment given me under the Last Will and Testament of [donor] . . . hereby expressly exercise the aforesaid power by appointing one half of the assets subject to it to my brother, William Foster . . .

*Id.* Nowhere in his will does Jacob state that he is exercising the power of appointment or that he is appointing the trustee

of the Family Trust (Joyce) to receive the property that is subject to the power. There is no mention of the property that is subject to the power of appointment. There is no reference to Lurine's will or to the specific power granted to him by Lurine's will—only a generic reference in the introductory article to "any property over which I may have a power of appointment."[3] Taking into consideration the context in which the words "power of appointment" are mentioned in Article 1, and the lack of any corresponding disposition in the entire balance of the instrument, it strains any reasonable construction to conclude that by this language Jacob *exercised* the power of appointment in favor of Joyce, as trustee of the Family Trust. This language simply does not manifest a present intention to exercise a specific power of appointment and, at the very least, leaves Jacob's intent open to question.

The word "intend," as used in Article 1, indicates an expectation or contemplation rather than a specific undertaking. This interpretation is supported by the fact that Jacob makes his initial statement of his "intentions" in Article 1 and then proceeds, article by article, to carry them out—with the "power of appointment" being the one exception. After making a precatory statement in Article 1, Jacob makes his declarations (Article 2), devises and bequeaths his property (Articles 3—4), appoints an executrix of his estate (Article 5), issues directives as to payment of taxes and expenses upon his death (Article 6), and gives specific instructions as to the burial and disposition of his body after his death (Article 7), each time using language of present tense command to carry his stated intentions into effect. Jacob, however, never again mentions the power of appointment, directly or indirectly, nor does he issue any directives to carry into effect any notion he might have had to exercise the power.

---

**3.** There is nothing in the record to indicate whether Jacob held powers of appointment

other than the power granted to him in Lurine's will.

Jacob's will is replete with expressions of directions and commands, which by legal and common understanding operate to execute all of his other stated objectives. *See e.g.,* Article 2 ("I declare ..."); Article 3 ("I give and devise ..."); Article 4 ("I give, devise and bequeath ..."); Article 5 ("I nominate and appoint ..."); Article 6 (" I direct ..."); Article 7 ("I direct ..."); and Article 8 ("I further direct ..."). Noticeably absent is any provision in which Jacob purports to exercise the power of appointment Lurine gave to him in her will.[4] Given the consistent and uniform style and overall scheme Jacob adopted in his will, one would expect to see an article in which he undertook to act upon any intention he had to exercise the power, but there is no "*I appoint ...*" or "*I exercise ...*" language anywhere in his will. That Jacob knew how to use clear and express language of present tense command to execute his objectives and give directions to effect his intentions is not only demonstrated in multiple places in his will, but is also apparent from the trust instrument he signed to create the Family Trust. *See e.g.,* Amended and Restated Trust Agreement for the Jacob Greenberg Family Trust, Article VII ("Settlor nominates and appoints ..."). The fact that Jacob did not use such appointive language in the one place in his will that contains any reference to a power of appointment is some indication that he did *not* intend to exercise the power. Moreover, the uncertainty and ambiguity resulting from the omission of appointive language leaves the door open for other reasonable intentions that could be imputed to him. For example, it is possible that Jacob initially contemplated exercising the power and had an article dedicated to the execution of it, but thereafter changed his mind and removed that article from the body of the document,

without removing the precatory language in Article 1.

To reach its conclusion that Jacob exercised the power, the majority must, by implication, supply words of appointment that one intending to exercise the power should have used but which are not clearly implied in the instrument. The court's task, however, is not to fill the gaps in Jacob's will by supplying the words that Jacob might have intended to write; rather, the court must look at the words he *actually* used. *See Shriner's Hosp. v. Stahl,* 610 S.W.2d 147, 151 (Tex.1980); *White v. Taylor,* 155 Tex. 392, 286 S.W.2d 925, 928 (1956); *Gregg v. Jones,* 699 S.W.2d 378, 379 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.) (expressly declining to "resort to the substitution of words for the words of the testatrix"). The mere mention of a power of appointment, without appointive language, is insufficient to constitute an exercise of the power.

### 2. Ambiguous and Incongruous Language

In ascertaining Jacob's intentions *vis a vis* the power of appointment granted to him in Lurine's will, and in determining the proper construction to be placed on the language he used in his own will, the court must be mindful of the legal nature of a power of appointment. Under well settled Texas law, a power of appointment is *not* property but "a mere right or power." *Krausse,* 430 S.W.2d at 47. The authority that Lurine, as the donor, gave to Jacob, as the donee, by the power of appointment did not vest in Jacob any estate, interest, or title in the property that is subject to the power. *See Nowlin v. Frost Nat'l Bank,* 908 S.W.2d 283, 287 (Tex.App.— Houston [1 st Dist.] 1995, no writ). It is critical to note that Jacob did not *own* the property subject to the power,[5] nor did

---

4. In refusing to find an exercise of the power of appointment in *Republic,* the Texas Supreme Court noted the absence of "any language stating the will is exercising such power of appointment." 283 S.W.2d at 47.

5. *See Republic,* 283 S.W.2d at 46. ("A power of appointment is a power of disposition given to a person over property *not his own ...,*") (quoting Thompson on Wills 596, § 400 (3d ed.)) (emphasis added).

that property belong to his estate. Because of this legal principle, Jacob's reference to *"my property"* in Article 1 and to *"my estate"* in Article 4 cannot be overlooked or ignored in determining his intent.[6] Jacob's choice of the word "my" as a limiting modifier in each of the provisions on which the majority relies to find an exercise of the power must be considered in light of the well established legal principle that a power of appointment is merely a power to direct the disposition of property[7] and is not itself property nor is it recognized as such within the law.

In determining whether Jacob, as donee, exercised the power of appointment, it is the duty of the court to look to the language Jacob actually used[8] and to give effect to every part of his will, if it is legally possible or practicable. *See Henderson*, 150 S.W.2d at 154. The statement in Article 4 (residuary clause) in which Jacob bequeaths to Joyce, as trustee of the Family Trust "the rest, residue and remainder of *my* estate"[9] cannot be construed to include any property subject to the power of appointment because that property did not belong to Jacob or his estate.[10] For this simple reason, it is not legally possible or practicable to give effect to a construction that includes the property of Jacob's Trust in the disposition of Jacob's residuary estate.

The same rationale applies to the phrase in Article 1 which states "I intend to dispose of *my* property."[11] It is not possible to take these words at face value and, at the same time, interpret them to include "any property over which [Jacob] may have a power of appointment" because, as a matter of law, the former does not include the latter. The presence of this incongruity in the first sentence of Article 1 is only compounded in the sentence that immediately follows in which Jacob explains that "[s]*uch property* will consist of …"[12] his separate property and his interest in community property. Notably, the law does not view a power of appointment as either separate or community property. Moreover, the property that is subject to the power of appointment is not Jacob's property—separate or community—but is the property of Jacob's Trust. While it is always preferable to give effect to every word and phrase in a will, it is not always possible to do so. The incongruities in Article 1 cannot be harmonized. Thus, the one place in Jacob's will that makes any reference to a power of appointment contains a *non sequitur*.

6. "The presumption should be indulged that the testator did not intend to use any meaningless or superfluous words, but that he intended for every provision, clause or word in his will to have a meaning in the disposition to be made of his property." *Henderson v. Stanley*, 150 S.W.2d 152, 154 (Tex.Civ.App.—Waco 1941), *rev'd on other grounds*, 139 Tex. 160, 162 S.W.2d 95 (1942).

7. Because anyone who takes through Jacob's power of appointment necessarily takes "under the authority of the power, as if the power and the instrument executing the power had been incorporated in one instrument," any appointee, in effect, takes from Lurine (the donor), not Jacob. *See Krausse*, 430 S.W.2d at 47. As the donee, Jacob is treated merely as the agent of the donor. *See id.*

8. *See Kettler v. Atkinson*, 383 S.W.2d 557, 561 (Tex.1964) (noting that "[i]n ascertaining the intention of the testatrix, we must give effect to the words selected by her").

9. Emphasis added.

10. "Estate" has a technical meaning, defined as "the real and personal property of a decedent. . . ." Tex. Prob.Code § 3(1) (Vernon Supp.1999); *see Hudson v. Hopkins*, 799 S.W.2d 783, 786 (Tex.App.—Tyler 1990, no writ). In connection with estate and succession taxes, a power of appointment operates to transfer the property from the donor, not the donee, to the appointee or takers in default. *See G.A.C. Halff Found. v. Calvert*, 281 S.W.2d 178, 183 (Tex.Civ.App.—San Antonio 1955, writ ref'd n.r.e.). "[P]roperty covered by the power is not a part of the 'estate' of the donee or 'property which passes by will' of the donee, whether or not the power is general and whether or not the donee exercised it." *Id.* at 184.

11. Emphasis added.

12. Emphasis added.

To conclude that Jacob exercised the power of appointment, the court must twice ignore Jacob's choice of the word "my" to describe the property he intended to dispose of in his will. Joyce argues that to do otherwise would impose too technical a reading on Jacob's will. Attributing Jacob's choice of words to inaccuracy of expression would be a viable option if his intent were otherwise clear from the instrument. The balance of the document, however, fails to demonstrate any intent to exercise the power of appointment. If anything, its silence on this weighty matter suggests that there was no intent to appoint the property. Under these circumstances and given the record in this case, there is no basis for twice departing from a strict reading of the words Jacob actually used in his will.[13] Moreover, the fact that it is necessary to do so in order to find an exercise of the power suggests that Jacob's intent to exercise it is less than clear.

### 3. Lack of Language Identifying Appointee or Connecting Power of Appointment to Residuary Estate

The "power of appointment" reference in Article 1 is not specifically tied to any appointee/beneficiary of the property that is subject to the power of appointment Lurine granted to Jacob. The residuary clause in Article 4 disposes of *Jacob's property* not otherwise bequeathed in his will. It does not mention the power of appointment or the property that is subject to the power, nor does it purport to identify any appointee of such property. Although the *Krausse* court found that the testatrix/donee of a power of appointment intended that the appointive estate become part of her residual estate, in doing so, the court relied on extraneous circumstances not present in this case.[14] More importantly, the residuary clause in *Krausse* specifically disposed of property over which the testatrix "may own or . . . over which [she] then shall have power of testamentary disposition." *Krausse*, 430 S.W.2d at 48–49. In contrast, the residuary clause in Jacob's will merely names the beneficiary of the "rest, residue and remainder of my estate" (which, as noted, cannot include any power of appointment or property subject to the power), but does not make any reference whatsoever to the power of appointment or the property that is subject to it, nor does the residuary clause purport to include or dispose of any property over which Jacob may have a power of appointment.

The residuary clause in Article 4 does nothing that could arguably constitute an exercise of the power of appointment, and there is nothing in Article 4 that evinces any intention to do so. Unlike the will in *Krausse*, there is nothing in Jacob's will to provide a nexus between the power of appointment and the residuary estate. There is no clear statement of intent in Jacob's will or anything in the record to suggest that Jacob intended to include an appointive estate, consisting of the property that is subject to the power of appoint-

**13.** *See Weathers v. Robertson,* 331 S.W.2d 87, 89 (Tex.Civ.App.—Beaumont 1959, writ ref'd n.r.e.) ("Words in general, whether technical or popular are to be taken in their plain and usual sense, unless a clear intention to use them in another sense can be collected and that sense ascertained besides. All other things being equal the natural and literal import of words and phrases is presumed to have been intended.") (quoting *Heinatz v. Allen,* 147 Tex. 512, 217 S.W.2d 994, 997 (Tex. 1949)).

**14.** The *Krausse* court found that the testatrix intended to "merge" the property over which she had the power of appointment with her

personal estate based on (1) language in the residuary clause in her will which made reference to the power of appointment; (2) in the absence of a "merger," there would have been insufficient funds available, making the special bequests "nugatory, a result which the [testatrix] in all probability did not intend;" (3) certain provisions in the will would have been unnecessary unless there was a blending of the estates; and (4) the estate other than the appointive estate consisted only of a relatively small amount of cash and the appointive estate was quite large. 436 S.W.2d at 48–49.

ment Lurine granted to Jacob, within the meaning of "my estate." It simply requires too big a leap to bridge the precatory Article 1 (which contains a crippling incongruity with respect to the power of appointment) and Article 4 (which makes no mention of the power of appointment at all) together in order to find an exercise of the power in favor of Joyce, as the trustee of the Family Trust.

The residuary estate clause is not a catchall for the unexecuted powers of a testator who happens to be the donee of a specific power of appointment. The basic purpose of a residuary clause is to prevent partial intestacy. *See Morris v. Finkelstein,* 442 S.W.2d 452, 455 (Tex.Civ.App.— Houston [14th Dist.] 1969, writ ref. n.r.e.). It is not intended to operate as a default provision where a donee of a power of appointment fails to exercise the power. Just as a power of appointment is not property capable of being bequeathed,[15] the exercise of a power of appointment is not a bequest. A power of appointment may not be exercised merely by naming a residual beneficiary in the donee's will, particularly where there is no appointive language anywhere in the instrument and nothing to tie the appointment to the appointee/beneficiary in the residuary clause. Deeming the residual beneficiary the appointee of property that is subject to a power of appointment without specific words of appointment in the residuary clause or some other nexus between the exercise of the power of appointment and the residual beneficiary violates the spirit as well as the letter of *Republic.*

### CONCLUSION

This is not a case in which the donee's manifest intention is obscured by an inaccurate mode of expression. Here, there is nothing to demonstrate "so clear" an intent by Jacob to exercise the power of appointment in favor of the trustee of the Family Trust so as to exclude all other reasonable intents. The majority finds

that two provisions in Jacob's will, when read together, are sufficient to find an exercise of the power of appointment in favor of Joyce, as trustee of the Family Trust. In the precatory Article 1, Jacob used the word "my" to describe the property he sought to dispose of in his will. In the residuary clause of Article 4, he used the same possessive pronoun to describe the estate he bequeathed to Joyce, as trustee of the Family Trust. Any reference by Jacob to *"my* property" or *"my* estate" is wholly inconsistent with the notion of disposing of property subject to the power of appointment Lurine granted to Jacob because that property belonged to Jacob's Trust, *not to Jacob.* In finding an exercise of the power of appointment, the majority must not only ignore Jacob's use of the word "my" in both places, but must also insert, by implication, words of appointment not found or implied in the four corners of the instrument.

Jacob was no stranger to sophisticated estate planning. After the death of his first wife (Lurine), he served as trustee for both Jacob's Trust and Karon's Trust. He later created the Family Trust with his second wife (Joyce). Long before Jacob signed his will in April 1991, Texas law made it clear that a power of appointment is not a property interest and that the property that is subject to the power is not vested in the donee (Jacob). *See Krausse,* 430 S.W.2d at 47. It is reasonable to presume that Jacob appreciated the legal character of the power and was cognizant of the fact that absent his exercise of it, the property that was subject to that power would pass to Karon's Trust for the benefit of his only child and her descendants. By the same token, it is unreasonable to presume that Jacob intended to exercise a very important power granted to him in Lurine's will by using cryptic and ambiguous references that must be pieced together from two unrelated articles in his own will and that deviate in style and

**15.** *See G.A.C. Halff Found.,* 281 S.W.2d at 184.

format from all other directions and commands in the instrument.

The Texas Supreme Court, after observing that the language of the will being construed in *Republic* "showed that it was most probably drawn by an attorney,"[16] reasoned that it was *"most improbable ... that either [the testator] or an attorney knowing of the power of appointment, and ... seeking to draw a will exercising such power, would omit in the will drawn any reference whatever to such power."* 283 S.W.2d at 48 (emphasis added). Employing this same rationale, it seems highly improbable that, in the face of *Republic*, Jacob or his attorney would undertake to exercise the power of appointment granted to Jacob in Lurine's will without (1) utilizing appointive language, *or* (2) referring to either the specific power being exercised or the property being appointed, *or* (3) expressly directing where or to whom the appointed property was to go. It is also unlikely that Jacob would have used terms such as "my property" and "my estate" to refer to property which, as a matter of law, did not belong to him and which was not part of his estate. Had Jacob intended to exercise the power, surely he would have done so in a direct, clear and positive way, or at least in a way that did not make it doubtful and uncertain as to whether it was his intention to do so. Had Jacob intended for the property subject to the power to pass to Joyce, as trustee of the Family Trust, surely he would not have left it to the courts to find, by stretching and straining, that which he could have so easily stated expressly.

The majority reaches beyond the boundaries of *Republic* and its progeny to find the exercise of a power of appointment where none exists. Moreover, it does so in the face of evidence that makes it doubtful as to whether it was Jacob's intention to execute the power. The presence of this doubt in and of itself is sufficient under *Republic* to preclude any finding of an exercise of the power of appointment. Whatever Jacob's true intent may have been, at the end of the day, it cannot be said that his intent to exercise the power was "so clear that no other reasonable intent can be imputed under [his] will." *Republic*, 283 S.W.2d at 47. Therefore, under *Republic* there can be no finding that Jacob intended to execute the power of appointment.

I would reverse the trial court's rendition of summary judgment, which found as a matter of law that Jacob exercised the power of appointment granted to him in Lurine's will in favor of Joyce, as trustee of the Family Trust, and remand that issue for further proceedings.

---

**16.** Texas courts have recognized that lawyers use terms in wills in a technical sense. *See Bergin v. Bergin*, 159 Tex. 83, 315 S.W.2d 943, 946 (1958) (holding that a layman "cannot be deemed to have used words in the same technical sense that the words might have if they were used by an attorney").